Lisa R. Petersen (7598)
Michael D. Kendall (11404)
**PARSONS KINGHORN HARRIS**
A Professional Corporation
111 East Broadway, 11th Floor
Salt Lake City, Utah  84111
Telephone:  (801) 363-4300

*Attorneys for Taylorsville City, Larry Marx, and Casey Davies*

---

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DIVISION, DISTRICT OF UTAH

| | |
|---|---|
| JIM AND DEBRA EVANS, and JIM and DEBRA EVANS, as Guardian Ad Litem for Justin Evans, a Minor,<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>TAYLORSVILLE CITY, a body politic, Taylorsville City Chief of Police LARRY MARX, Taylorsville police officer CASEY DAVIES, ANDREA DIRKER, ANTONIA LENNING and DAVID LENNING,<br><br>　　　　　Defendants. | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 02:06CV631<br><br>Judge Ted Stewart<br>Magistrate Judge Paul M. Warner |

Defendants Taylorsville City ("Taylorsville"), Larry Marx ("Chief Marx"), and Casey Davies ("Detective Davies") (collectively "Defendants"), by and through counsel of record, hereby respectfully submit Defendants' Memorandum of Points and Authorities in Support of Motion for Summary Judgment.

## <u>INTRODUCTION</u>

This case involves: (1) the theft of a Boston terrier (the "Dog") from the residence of Antonia Lenning ("Mrs. Lenning") and David Lenning ("Mr. Lenning") (collectively the "Lennings") on May 11, 2006, where Andrea Dirker ("Ms. Dirker"), the daughter of the Lennings, was residing and caring for the Dog at the time of the theft; and (2) the criminal investigation, by the Taylorsville City Policy Department, of Jim Evans ("Mr. Evans"), and his son Justin Evans concerning the theft of the Dog.

In approximately 2002, Ms. Dirker and Chris Erying ("Mr. Erying"), who were cohabiting at the time, were asked by Mr. Evans, a friend of Mr. Erying, to take custody of the Dog. Ms. Dirker and Mr. Erying agreed to take custody of the Dog at that time and continued to care for the Dog until approximately 2005, when Ms. Dirker and Mr. Erying discontinued their relationship and went their separate ways. As a result, Ms. Dirker and the Dog moved in with the Lennings, where Ms. Dirker cared for the Dog until it was stolen from the Lennings' residence on May 11, 2006.

On May 11, 2006, while Mrs. Lenning was outside her residence with the Dog, Mr. Evans and his son approached the Lennings' residence on foot, stole the Dog, and quickly left the scene in their automobile. The Taylorsville Police Department was notified of the theft, and Detective Davies was assigned to conduct a criminal investigation into the theft of the Dog.

On May 22, 2006, after speaking with Officer Scott Miller ("Officer Miller") of the Taylorsville Police Department and reviewing his reports regarding the theft of the Dog, Detective Davies spoke with Mrs. Lenning and Ms. Dirker, who confirmed the information

contained in Officer Miller's reports regarding the theft of the Dog.  Thereafter, Detective Davies spoke with Debra Evans ("Mrs. Evans"), in person, at her residence and with Mr. Evans, by telephone, regarding the theft of the Dog.  Mr. Evans informed Detective Davies that he had the Dog, but would not return or relinquish the Dog to Detective Davies or Ms. Dirker.  Mr. Evans further informed Detective Davies that he would need to obtain a search warrant if he intended to return to the Evans' residence.

On May 25, 2006, after unsuccessfully attempting to contact Mr. Evans on various occasions, Detective Davies finally received a telephone call from Mr. Evans.  Detective Davies informed Mr. Evans that, although the case had been sent to the Salt Lake District Attorneys' Office ("District Attorneys' Office"), no further police action would be taken if Mr. Evans would merely relinquish the Dog and resolve any dispute as to the ownership of the Dog in civil court. Despite this information, Mr. Evans refused to relinquish the Dog.

Upon receiving this information from Mr. Evans and reviewing this case with the District Attorneys' Office to verify that Mr. Evans' conduct constituted a theft, possession of stolen property, and/or obstruction of justice, Detective Davies obtained a search warrant later that day, which was signed by Judge Valdez of the Third District Court (the "Search Warrant").  Rosa M. Rivera ("Sergeant Rivera"), Detective Davies' ranking officer, agreed with Detective Davies' decision to seek and obtain the Search Warrant to retrieve the Dog.  Sergeant Rivera further believed that there was probable cause to seek the Search Warrant to retrieve the Dog and reviewed the Affidavit for Search Warrant relating to the Evans' residence and the Dog

("Affidavit of Search Warrant") before it was presented to the District Attorneys' Office and Judge Valdez.

At approximately 2:00 p.m. that afternoon, after holding a search warrant briefing, Detective Davies and the Taylorsville Police Department executed the Search Warrant at the Evans' residence in an attempt to retrieve the Dog. In doing so, Detective Davies and Sergeant Rivera encountered Mrs. Evans, who acknowledged that the Dog was not in the Evans' residence but refused to cooperate with Detective Davies and Sergeant Rivera and further refused to disclose the location of the Dog to Detective Davies and Sergeant Rivera.

Based upon Mrs. Evans' acknowledgement that the Dog was not in her residence, her refusal to cooperate with Detective Davies and Sergeant Rivera, and her unwillingness to disclose to Detective Davies and Sergeant Rivera the location of the Dog, Detective Davies and Sergeant Rivera had probable cause to arrest Mrs. Evans. Prior to arresting Mrs. Evans, however, Detective Davies provided Mrs. Evans with an additional opportunity to avoid being arrested when he advised Mrs. Evans that if she failed to disclose the location of the Dog she would be arrested for interfering with a police investigation and for obstruction of justice. After refusing to disclose the location of the Dog for a second time, interfering with a police investigation, and failing to cooperate with the Taylorsville City Police Department during the execution of the Search Warrant, Detective Davies and Sergeant Rivera arrested Mrs. Evans for obstruction of justice and booked her into jail. Mrs. Evans was released from jail that same day.

Shortly after Mrs. Evans was booked into jail, Detective Davies received a phone call from Mark Hindley ("Mr. Hindley"), who represented Mr. Evans. Detective Davies and Mr.

Hindley made arrangements to obtain the Dog, which was relinquished to Detective Davies by Mr. Erying later that evening. Upon receiving the Dog, Detective Davies contacted Ms. Dirker, informed her that he was in possession of the Dog, and arranged to meet her at the Taylorsville Police Department, where he released the Dog to her that evening.

Throughout the investigation, Detective Davies and the Taylorsville Police Department pursued this matter in a manner consistent with past investigations of stolen property. Detective Davies and the Taylorsville Police Department used the resources they had available to retrieve the Dog and to investigate the theft of the Dog. Detective Davies treated the investigation into the theft of the Dog with as much respect and fairness as any other matter he investigated in his seven years of service as a law enforcement officer.

In light of the arrest of Mrs. Evans and the criminal investigation into the theft of the Dog, which involved Mr. Evans and his son, Plaintiffs brought an action in this Court against Defendants on or about June 31, 2006, and asserted claims under Section 1983 of the Civil Rights Act, under Article I, Section 9 of the Utah Constitution, for abuse of process, and for attorney fees under Section 1988 of the Civil Rights Act.

Summary judgment is appropriate on all of the Plaintiffs' claims because: 1) Mrs. Evans was not deprived of a Constitutional right; 2) Plaintiffs were not treated with unnecessary rigor; 3) the legal process used in this case was used for its proper purpose; 4) Defendants' investigation had no ulterior purpose and Defendants' conduct did not constitute a wilful act; and 5) Plaintiffs cannot prevail on any of their alleged claims under Section 1983 of the Civil Rights

Act, precluding them from obtaining an award of attorneys' fees under Section 1988 of the Civil Rights Act.

## STATEMENT OF UNDISPUTED FACTS

1.      Detective Davies is currently employed with the Taylorsville City Police Department.  Detective Davies has been employed with the Taylorsville City Police Department since approximately March of 2005.  <u>See</u> Affidavit of Casey Davies ("Davies Affidavit") ¶ 2 filed contemporaneously herewith and incorporated herein by this reference.

2.      Prior to Detective Davies' employment with the Taylorsville City Police Department, Detective Davies was employed as a police officer with the Sandy City Police Department from approximately February of 2001 through March of 2005.  <u>See</u> <u>id</u>. ¶ 3.

3.      Prior to Detective Davies' employment with Sandy City, Detective Davies was employed with the Salt Lake County Sheriff's Department as a correction officer from approximately July 2000 to February of 2001.  <u>See</u> <u>id</u>. ¶ 4.

4.      Since March of 2005, Sergeant Rivera has been employed by the Taylorsville City Police Department in various positions including, but not limited to: (a) Lieutenant over Patrol Operations (August of 2008 through the present); (b) Property Crimes Investigation Sergeant (March of 2005 through August of 2008); (c) Person Crimes Investigations Sergeant (March of 2005 through June of 2007); (d) Enforcement Unit Director (December of 2006 through August of 2008); and Public Information Officer (March of 2005 through the present). <u>See</u> Affidavit of Rosa M. Rivera ("Rivera Affidavit") ¶ 2 filed contemporaneously herewith and incorporated herein by this reference.

5.      In the various positions that Sergeant Rivera has held while employed by the Taylorsville City Police Department, she has gained extensive experience in: (a) apprehending and arresting suspects; (b) interviewing suspects; (c) interviewing witnesses; (d) obtaining, executing, and supervising search warrants; (e) preparing and analyzing police reports; (f) managing numerous cases from beginning to end; and (g) supervising several detectives and forensic specialists.  See id. ¶ 3.

6.      Prior to Sergeant Rivera's employment by the Taylorsville City Police Department, she was employed by the Salt Lake County Sheriff's Office from approximately September of 1994 through March of 2005.  See id. ¶ 4.

7.      While employed by the Salt Lake County Sheriff's Office, Sergeant Rivera held the following positions: (a) Public Information Officer (February of 2004 through February of 2005); (b) Property Crimes Investigative Sergeant (December of 2001 through February of 2004); (c) Acting Lieutenant – Draper City Liaison (September of 2002 through December of 2002); (d) Patrol Sergeant (December of 2000 through December of 2001); (e) Metro Gang Detective (July of 1996 through December of 2001); Community Action Team Deputy (April of 1995 through July of 1996); and Patrol Deputy (September of 1994 through April of 1995).  See id. ¶ 5.

8.      In the various positions that Sergeant Rivera held while employed by the Salt Lake County Sheriff's Office, she gained extensive experience in: (a) apprehending and arresting suspects; (b) interviewing suspects; (c) interviewing witnesses; (d) obtaining, executing, and supervising search warrants; (e) managing numerous cases from beginning to end; (f)

coordinating squad briefings and making assignments; (g) preparing and analyzing police reports; and (h) supervising several detectives and deputies. See id. ¶ 6.

9. Prior to Sergeant Rivera's employment by the Salt Lake County Sheriff's Office, Sergeant Rivera was employed by the Weber State Police Department from approximately September of 1993 through September of 1994. See id. ¶ 7.

10. While employed by the Weber State Police Department, Sergeant Rivera: (a) responded to and investigated citizen complaints and emergencies; (b) interviewed suspects, witnesses, and victims; and (c) prepared police reports and wrote citations. See id. ¶ 8.

11. In May of 2006, Detective Davies received the reports of Officer Miller of the Taylorsville Police Department regarding the reported theft of the Dog. See Davies Affidavit ¶ 5.

12. Upon reviewing Officer Miller's reports and speaking with Officer Miller, Detective Davies learned that the theft of the Dog occurred on May 11, 2006, at the Lennings' residence, located at 5694 Canal Street, Taylorsville, Utah, where Ms. Dirker was residing on May 11, 2006. See id. ¶ 6.

13. Detective Davies further learned and was informed that: 1) Ms. Dirker and her ex-boyfriend Mr. Eyring received the Dog, in approximately 2002, from Mr. Evans, one of Mr. Eyring's friends; 2) Ms. Dirker and Mr. Eyring discontinued their relationship in approximately 2005, and, as a result, Ms. Dirker took possession of the Dog and moved in with the Lennings, where she cared for the Dog until it was stolen on May 11, 2006; 3) the Dog was stolen from the Lennings' residence by a tall thin adult male accompanied by a teenage male who fled the scene

in a colored SUV; and 4) Mr. Evans, who owns a SUV similar to the vehicle that fled the scene after the Dog was stolen and who has a teenage son about the same age as the teenager reportedly seen with the adult male at the time the Dog was stolen, fit the description of the adult male that stole the Dog.  <u>See</u> <u>id</u>. ¶ 7.

14.    On May 22, 2006, after reviewing Officer Miller's reports and speaking with Officer Miller, Detective Davies successfully contacted Ms. Dirker, by telephone, to follow up on the theft of the Dog.  <u>See</u> <u>id</u>. ¶ 8.

15.    Ms. Dirker, in her telephone conversation with Detective Davies, informed him that she and Mr. Erying had lived together from approximately 2001 to 2005 and were asked by Mr. Evans, a friend of Mr. Erying, to take custody of the Dog in approximately 2002.  <u>See</u> <u>id</u>. ¶ 9.

16.    Ms. Dirker then proceeded to inform Detective Davies that she, Mr. Erying, and Mr. Evans made a verbal agreement, in approximately 2002, that Ms. Dirker and Mr. Erying would take custody of the Dog, but that Mr. Evans and his family could visit the Dog when they were in town.  <u>See</u> <u>id</u>. ¶ 10.

17.    Ms. Dirker also informed Detective Davies that: 1) in approximately 2005, she and Mr. Erying discontinued their relationship and went their separate ways; 2) as a result of her discontinued relationship with Mr. Erying, Ms. Dirker took possession of the Dog and moved in with the Lennings; and 3) while living at the Lennings, Ms. Dirker continued to care for the Dog until Mr. Evans and his son stole the Dog from the Lennings' residence on May 11, 2006.  <u>See</u> <u>id</u>. ¶ 11.

18.     On May 22, 2006, after reviewing Officer Miller's reports and speaking with Officer Miller, Detective Davies successfully contacted the Lennings to follow up on the theft of a Dog.  See id. ¶ 12.

19.     The Lennings informed Detective Davies that on May 11, 2006: 1) Mrs. Lenning was outside her home with the Dog; 2) during the time that Mrs. Lenning was outside with the Dog, an adult male and a teenage boy approached their residence, specifically their U-shaped concrete driveway, on foot; 3) as the adult male and teenage boy were approaching their residence, the Dog ran up to the adult male and teenage boy; 4) as the Dog ran in the direction of the adult male and teenage boy, Mrs. Lenning informed them that the Dog was harmless; 5) shortly after Mrs. Lenning's comment, the adult male picked up the Dog, and, after securing the Dog, the adult male and teenage boy immediately turned toward their vehicle parked nearby and fled on foot; and 6) upon arriving at their vehicle, the adult male and teenage boy entered the vehicle, while still possessing the Dog, and quickly left the scene.  See id. ¶ 13.

20.     After speaking with Ms. Dirker and the Lennings, Detective Davies was able to speak with Mr. Evans, on various occasions via telephone, about the Dog.  See id. ¶¶ 17, 19, 24-25, & 28.

21.     During Detective Davies' various conversations with Mr. Evans, Mr. Evans informed Detective Davies that: 1) the Dog belonged to him; 2) he would not give the Dog back to Ms. Dirker because he, not Ms. Dirker or the Lennings, was the owner of the Dog; and 3) if Detective Davies intended to return to his residence, Detective Davies would need a search warrant.  See id. ¶¶ 19, 24-25, & 28.

22.     After Detective Davies' various conversations with Mr. Evans, Detective Davies spoke with Howard Lemke ("Mr. Lemke") of the District Attorneys' Office regarding Mr. Evans' removal of the Dog from the Lennings' residence.  Upon receiving Detective Davies' explanation of events, Mr. Lemke informed Detective Davies that there was sufficient evidence and probable cause to charge Mr. Evans with theft.  <u>See</u> <u>id</u>. ¶ 29; <u>see also</u> Affidavit of Search Warrant at 4 attached hereto as Exhibit "A" (demonstrating that Mr. Lemke believed there was probable cause to charge Mr. Evans with theft based on his review and approval the Affidavit for Search Warrant).

23.     On May 24, 2006, Detective Davies unsuccessfully attempted to contact Mr. Evans, by telephone, on at least two separate occasions.  <u>See</u> <u>id</u>. ¶ 30.

24.     On May 25, 2006, Detective Davies again unsuccessfully attempted to contact Mr. Evans, by telephone.  <u>See</u> <u>id</u>. ¶ 32.

25.     Later that day, Detective Davies received a telephone call from Mr. Evans. During the telephone conversation, Detective Davies informed Mr. Evans that, although the case had been sent to the District Attorney's Office, no further police action would be taken if he would merely relinquish the Dog.  <u>See</u> <u>id</u>. ¶ 33.

26.     Despite this information, Mr. Evans refused to relinquish the Dog.  <u>See</u> <u>id</u>. ¶ 34.

27.     Upon Mr. Evans' refusal to relinquish the Dog, Detective Davies once again reviewed this case with Mr. Lemke, both over the telephone and in person, in order to verify that Mr. Evans' conduct constituted a theft.  <u>See</u> <u>id</u>. ¶ 35.

28.     Upon the determination that there was sufficient evidence and probable cause to charge Mr. Evans with theft, Detective Davies sought and obtained the Search Warrant, which was signed by Judge Valdez of the Third District Court and dated May 25, 2006.  See id. ¶ 35.

29.     Sergeant Rivera agreed with Detective Davies' decision to seek and obtain the Search Warrant to retrieve the Dog.  See Rivera Affidavit ¶ 9.

30.     Sergeant River further believed that there was probable cause to seek the Search Warrant to retrieve the Dog.  See id. ¶ 10.

31.     Sergeant Rivera reviewed the Affidavit for Search Warrant, which was signed by Detective Davies, before it was presented to Mr. Lemke and Judge Valdez.  See id. ¶ 10.

32.     After Detective Davies obtained the Search Warrant, Detective Davies drafted a Taylorsville Police Department Operation Plan ("Operation Plan") and submitted it to Sergeant Rivera for approval.  Once Sergeant Rivera reviewed and approved the plan, she submitted it to Chief Marx who reviewed and approved the plan.  See Davies Affidavit ¶ 37; see also Rivera Affidavit ¶ 12.

33.     Upon approval of the Operation Plan, Detective Martinez, Detective Lloyd, Detective Johnson, Sergeant Rivera, and Detective Davies met for a "search warrant briefing" to discuss the execution of the Search Warrant later that day.  See Davies Affidavit ¶ 38; see also Rivera Affidavit ¶ 13.

34.     After the search warrant briefing, Detective Davies, along with various other Taylorsville Police Officers, proceeded to execute the Search Warrant at approximately 2:00 p.m. on May 25, 2006.  See Davies Affidavit ¶ 39; see also Rivera Affidavit ¶ 14.

35.     In so doing, Detective Davies and Sergeant Rivera came into contact with Mrs. Evans, identified themselves, and informed Mrs. Evans that they had obtained the Search Warrant to go inside her residence in order to retrieve the Dog.  <u>See</u> Davies Affidavit ¶ 41; <u>see also</u> Rivera Affidavit ¶¶ 14-15.

36.     The Taylorsville City Police Officers proceeded to execute the Search Warrant by entering the Evans' residence in an attempt to retrieve the Dog.  <u>See</u> Davies Affidavit ¶ 42; <u>see also</u> Rivera Affidavit ¶¶ 16-17.

37.     While the Taylorsville City Police Officers were in the process of executing the Search Warrant, Mrs. Evans informed Sergeant Rivera and Detective Davies that the Dog was not in the residence; however, she refused to disclose to Sergeant Rivera and Detective Davies the location of the Dog.  <u>See</u> Davies Affidavit ¶ 43; <u>see also</u> Rivera Affidavit ¶ 17.

38.     Based upon Mrs. Evans' acknowledgement that the Dog was not in her residence, her refusal to cooperate with the Taylorsville City Police Department, and her refusal to disclose to Sergeant Rivera and Detective Davies the location of the Dog, Detective Davies and Sergeant Rivera had probable cause to arrest Mrs. Evans.  <u>See</u> Rivera Affidavit ¶ 18.

39.     Prior to arresting Mrs. Evans, however, Detective Davies proceeded to inform Mrs. Evans that if she failed to provide him with the location of the Dog she would be arrested for obstruction of justice.  <u>See</u> Davies Affidavit ¶ 44; <u>see also</u> Rivera Affidavit ¶ 19.

40.     After refusing to disclose the location of the Dog for a second time, interfering with a police investigation, and failing to cooperate with the Taylorsville City Police Department

during the execution of the Search Warrant, Detective Davies and Sergeant Rivera arrested Mrs. Evans for obstruction of justice.  See Davies Affidavit ¶ 45; see also Rivera Affidavit ¶¶ 20-21.

42.     Shortly thereafter, Sergeant Rivera and Detective Davies booked Mrs. Evans into jail.  See Davies Affidavit ¶ 47; see also Rivera Affidavit ¶ 22.

42.     Later that day, Detective Davies received a telephone call from Mr. Hindley, an attorney who informed Detective Davies that he represented Mr. Evans.  See Davies Affidavit ¶ 52.

43.     Mr. Hindley informed Detective Davies that he would speak with his client, Mr. Evans, in an attempt to persuade him to relinquish the Dog.  See id. ¶ 53.

44.     Shortly thereafter, Detective Davies made arrangements with Mr. Hindley and/or Mr. Evans to obtain possession of the Dog.  See id. ¶ 54.

45.     Mr. Erying, later that day, arrived with the Dog and relinquished possession thereof to Detective Davies.  See id. ¶ 56.

46.     Later that evening, Detective Davies released the Dog to Ms. Dirker, who met Sergeant Rivera and Detective Davies at the offices of the Taylorsville Police Department.  See id. ¶ 57.

47.     Prior to May of 2006, Detective Davies met Ms. Dirker and the Lennings on merely one previous occasion, while on duty as a police officer with the Taylorsville City Police Department.  See id. ¶ 60.

48.     This encounter occurred when Detective Davies was dispatched to a parking problem in the area of Atherton Drive and 4700 South, Taylorsville, Utah.  See id. ¶ 61.

49.     The Lennings had filed a complaint related to a parking problem within the "Town Home Community."  See id. ¶ 62.

50.     As Detective Davies was carrying out his duties pertaining to the parking problem, he was introduced to Ms. Dirker and the Lennings.  See id. ¶ 63.

51.     This single encounter with Ms. Dirker and the Lennings was the first and only time that Detective Davies ever spoke to or encountered Ms. Dirker or the Lennings prior to May of 2006 (the date that Detective Davies was assigned to the criminal investigation related to the Dog).  See id. ¶ 64.

52.     Later in the evening but on the same day the Lennings filed their complaint regarding the parking problem within the "Town Home Community," Detective Davies was asked by his older brother Keith "Kip" Davies of the Murray City Police Department to assist him on a "keep the peace call" at the "Town Home Community," where a home owners association meeting was reportedly getting out of control.  See id. ¶ 65.

53.     Detective Davies' brother informed Detective Davies that the Lennings had requested the Murray City Police Department to assist in "keeping the peace" during the home owners association meeting.  See id. ¶ 66.

54.     Detective Davies arrived at the "Town Home Community" shortly after his brother requested assistance and remained there for approximately thirty (30) minutes until the situation deescalated.  See id. ¶ 67.

55.     At no time did Detective Davies receive any compensation for his assistance on this occasion from the Lennings, or from any other party, and at no time prior or subsequent to

this occasion has Detective Davies received any compensation from the Lennings or from any other party. Detective Davies was never employed, in any capacity, by the Lennings or by Ms. Dirker. <u>See</u> <u>id</u>. ¶ 68.

56. Detective Davies did not encounter the Lennings on the evening he assisted the Murray City Police Department on the "keep the peace call." <u>See</u> <u>id</u>. ¶ 69.

## <u>SUMMARY JUDGMENT STANDARD</u>

A Motion for Summary Judgment should be rendered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "When the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'" <u>Nebraska v. Wyoming</u>, 507 U.S. 584, 590 (1993) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)). In this matter, Plaintiffs are unable to establish the existence of the essential elements of their claims. Moreover, there are no genuine issues of material fact that would preclude summary judgment in favor of Defendants on all of Plaintiffs' claims. Accordingly, the Court should grant summary judgment in favor of Defendants on all of Plaintiffs' claims.

# ARGUMENT

**I.** **PLAINTIFFS' CLAIMS UNDER SECTION 1983 OF THE CIVIL RIGHTS ACT FAIL AS A MATTER OF LAW BECAUSE MRS. EVANS WAS NOT DEPRIVED OF A CONSTITUTIONAL RIGHT.**

Section 1983 of the Civil Rights Act "was enacted 'to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.'" Haines v. Fisher, 82 F.3d 1503, 1508 (10th Cir. 1996) (quoting Wyatt v. Cole, 504 U.S. 158, 161 (1992)).  The obvious purpose of Section 1983 of the Civil Rights Act is "'to provide a remedy to parties *deprived of constitutional rights* by a state official's *abuse of his position* while acting under color of state law.'" Haines, 82 F.3d at 1508 (quoting D.T. by M.T. v. Independent Sch. Dist. No. 16., 894 F.2d 1176, 1187 (10th Cir. 1990)) (emphasis added).  To state a claim under Section 1983 of the Civil Rights Act, "a plaintiff must show (1) a deprivation of a federally protected right, and (2) that the deprivation was committed by a person acting under color of state law." Potts v. City of Philadelphia, 224 F. Supp. 2d 919, 932 (E.D. Pa. 2002); see also Maryland v. Heyse, 315 F.2d 312, 314 (10th Cir. 1963).  Here, because Plaintiffs cannot show a deprivation of a federally protected right, their claims for unlawful arrest and unlawful detention and/or false imprisonment under Section 1983 of the Civil Rights Act fail as a matter of law.

    **A.** **PLAINTIFFS' SECTION 1983 CLAIM FOR UNLAWFUL ARREST FAILS AS A MATTER OF LAW.**

To prevail on a claim for false or unlawful arrest, a plaintiff must establish that the arresting officers lacked probable cause to arrest the plaintiff. Potts, 224 F. Supp. 2d at 932.

"The proper inquiry in a Section 1983 claim based on false arrest is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." Id. (citations omitted). "Probable cause exists when 'at the moment the arrest was made … the facts and circumstances within [the defendant's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that the plaintiff had violated the law." Id. (quoting Hunter v. Bryant, 502 U.S. 224, 228 (1991)). Although the determination whether probable cause exists is typically a question for the jury, "a court may conclude that probable cause exists as a matter of law if the evidence viewed most favorably to Plaintiff would not support a contrary factual finding." Potts, 224 F. Supp. 2d at 932 (citations omitted). In making this determination, "a court must consider the totality of the circumstances, and weigh the inculpatory evidence against the exculpatory evidence." Id. (citations omitted). Here, because there was probable cause to seek and obtain the Search Warrant and because there was probable cause to arrest Mrs. Evans, Plaintiffs' Section 1983 claim for unlawful arrest fails as a matter of law.

    1.    <u>Judge Valdez's Decision To Issue the Search Warrant To Search the Evans' Residence To Retrieve the Dog Was Based upon Probable Cause</u>.

Probable cause exists to obtain a search warrant if there is "'a fair probability that contraband or evidence of a crime will be found'" at the location where the search warrant will be executed. <u>United States v. Silveus</u>, 542 F.3d 993, 999 (3rd Cir. 2008) (quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983)). Probable cause relating to the issuance of a valid search

warrant "is not determined by hindsight but as of the time the affidavits were presented to the magistrate." United States v. Rahn, 511 F.2d 290, 292 (10th Cir. 1975) (citing Schoeneman v. United States, 317 F.2d 173 (U.S. App. D.C. 1963).

Here, because there was certainly a fair probability that the Dog, evidence of a crime, would be found at the Evans' residence, the location where the Search Warrant was to be executed, Judge Valdez's decision to issue the Search Warrant was based upon probable cause. In particular, the Affidavit of Search Warrant approved by Mr. Lemke and Sergeant Rivera and signed by Detective Davies contained the following information which established that there was a fair probability that the Dog would be found at the Evans' residence:

1.      "The undersigned affiant, Detective Casey Davies of the Taylorsville Police Department, being first duly sworn, deposes and says that he has reason to believe [that] on the premises of 1176 E. Herbert Avenue Salt Lake City, UT 84105 … there is now certain property or evidence described as: (1) Black and White Boston Terrier named "Oscar"[; and] (2) Any other fruits and/or instrumentalities determined to be evidence of the crimes of Theft and/or Possession of Stolen Property and/or Obstruction of Justice … and that said property or evidence: was unlawfully acquired or is unlawfully possessed, or has been used to commit or conceal a public offense, or is being possessed with the purposed to use it as a means of committing or concealing a public offense, or consists of an item or constitutes evidence of illegal conduct, possessed by a party to the illegal conduct." Affidavit of Search Warrant at 1 attached hereto as Exhibit "A."

2.      In May of 2006, Ms. Dirker called the Taylorsville Police to report that the Dog was stolen from her front yard at 5694 S. Canal St. Taylorsville, UT 84123. See id. at 2.

3.      Ms. Dirker owned, possessed, and cared for the Dog for quite some time before the Dog was stolen from her front yard. See id.

4.      A tall, thin male in his mid to late thirties, along with a teenage male, walked up to 5694 S. Canal St. Taylorsville, UT 84123, scooped up the Dog and fled the scene with the Dog. See id.

5.      Ms. Dirker informed Officer Miller that Mr. Evans fit the description of the male that stole the Dog from 5694 S. Canal St. Taylorsville, UT 84123.  Mr. Evans owned a silver Ford expedition vehicle, which is similar to the vehicle seen fleeing the scene with the Dog.  Mr. Evans has a teenage son about the same age as the teen seen with the male suspect that fled the scene with the Dog.  See id.

6.     On May 22, 2006, Mr. Evans informed Detective Davies, via telephone, that on "the day he took the dog, [Mr. Evans] and his son Justin Evans were in the front of the property [5694 S. Canal St. Taylorsville, UT 84123] and saw a couple of people that appeared to live at the residence and while they were standing in front of the driveway the dog came running out to greet them. One of the females (Toni Lenning) told [Mr. Evans] that the dog was nice and that it wouldn't hurt him. Once the dog came over to [Mr. Evans] and his son Justin, [Mr. Evans] bent down and picked up the dog and got into his vehicle and took off." See id. at 4.

7.     On May 22, 2006, Mr. Evans further informed Detective Davies, via telephone, that "he would not give the dog back to the complainant." See id.

Based upon the foregoing information, there was certainly a fair probability that the Dog, evidence of a crime, would be found at the Evans' residence, the location where the Search Warrant was to be executed. Therefore, Judge Valdez's decision to issue the Search Warrant to search the Evans' residence to retrieve the Dog was based upon probable cause. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' claim for unlawful arrest under Section 1983 of the Civil Rights Act.

> 2.     Detective Davies and Sergeant Rivera Had Probable Cause To Arrest Mrs. Evans.

Probable cause exists to arrest an individual if the "facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." Johnson v. London City Corp., 405 F.3d 1065, 1068 (10th Cir. 2005) (quoting Jones v. City & County of Denver, 854 F.2d 1206, 1210 (10th Cir. 1988)).

Here, Detective Davies and Sergeant Rivera had probable cause to arrest Mrs. Evans. In particular, the following facts and circumstances within the knowledge of Detective Davies and Sergeant Rivera at the moment they arrested Mrs. Evans, regardless of whether Mrs. Evans did,

in fact, commit the offense, were reasonably trustworthy and sufficient to warrant a prudent man

in believing that Mrs. Evans committed or was committing an offense in violation of the law:

1. Ms. Dirker and Mr. Erying lived together from approximately 2001 to 2005 and were asked by Mr. Evans, a friend of Mr. Erying, to take custody of the Dog during the time they lived together.  Davies Affidavit ¶¶ 7 & 9.

2. In approximately 2005, Ms. Dirker and Mr. Erying discontinued their relationship.  Id. ¶¶ 7 & 11.

3. As a result of the discontinued relationship, Ms. Dirker took possession of the Dog, moved in with the Lennings, and cared for the Dog until Mr. Evans and his son stole the Dog from the Lennings' residence on May 11, 2006.  Id. ¶ 11.

4. Mr. Evans admitted to Detective Davies that he was in possession of the Dog on May 22, 2006, but informed Detective Davies that he was unwilling to relinquish the Dog.  Id. ¶ 24.

5. On May 22, 2006, Mr. Evans informed Detective Davies that he would need a search warrant if he intended to return to Mr. Evan's home after May 22, 2006.  Id. ¶ 28.

6. On May 25, 2006, Mr. Evans, after being informed by Detective Davies that although his case had been referred to the District Attorneys' Office no further police action would be taken if he would merely relinquish the Dog, refused to relinquish the Dog and even refused to tell Detective Davies where he was keeping the Dog.  Id. ¶¶ 33-34.

7. Upon receiving this information from Mr. Evans and reviewing this case with the District Attorneys' Office, both over the telephone and in person, in order to verify that Mr. Evans' conduct constituted a theft, Detective Davies obtained the Search Warrant, which was signed and dated on May 25, 2006 by Judge Valdez of the Third District Court.  Id. ¶ 35.

8. On May 25, 2006, at approximately 2:00 p.m., Detective Davies, Sergeant Rivera, and various other Taylorsville City Police Officers executed the Search Warrant.  Id. ¶ 39.

9. During the execution of the Search Warrant, Detective Davies and Sergeant Rivera encountered Mrs. Evans, who informed the officers that the Dog was not in the home, but refused to disclose to Detective Davies and Sergeant Rivera the location of the Dog.  Id. ¶ 43.

10. Detective Davies informed Mrs. Evans that if she failed to provide him with the location of the Dog she would be arrested for obstruction of justice.  Id. ¶ 44.

11. When Mrs. Evans again refused to disclose to Detective Davies the location of the Dog, Detective Davies and Sergeant Rivera arrested her for obstruction of justice.  Id. ¶ 45.

Based upon the foregoing facts and circumstances, the inculpatory evidence to arrest Mrs.

Evans was extensive and overwhelming.  Most notably: (a) Mr. Evans informed Detective

Davies that he was in possession of the Dog but refused to relinquish the Dog; (b) Mrs. Evans

refused to disclose to Detective Davies and Sergeant Rivera the location of the Dog during the execution of the Search Warrant; and (c) Mrs. Evans refused, for a second time, to disclose the location of the Dog even after being informed that if she failed to provide Detective Davies with the location of the Dog she would be arrested for obstruction of justice. <u>See</u> <u>id</u>. ¶¶ 43-45.

In contrast, the exculpatory evidence available to Detective Davies and Sergeant Rivera when they arrested Mrs. Evans for obstruction of justice was extremely meager. In fact, the only exculpatory evidence Detective Davies and Sergeant Rivera had when they arrested Mrs. Evans was a claim by Mr. and Mrs. Evans that they owned the Dog. Despite the common practice for those accused of theft to claim a property right in the allegedly stolen item, as in this matter, Detective Davies did not reject Mr. and Mrs. Evans' claim to ownership in the Dog; rather, he encouraged Mr. and Mrs. Evans' to relinquish the Dog and to pursue Ms. Dirker in civil court to resolve the dispute as to the ownership of the Dog. <u>See</u> <u>id</u>. ¶¶ 20, 22, & 26. Nevertheless, when Mrs. Evans, after multiple opportunities, refused to disclose to Detective Davies and/or Sergeant Rivera the location of the Dog during the execution of the Search Warrant, Detective Davies and Sergeant Rivera had reasonably trustworthy information within their knowledge that was sufficient to lead a prudent person to believe that Mrs. Evans committed or was committing an offense. Consequently, Detective Davies and Sergeant Rivera had probable cause to arrest Mrs. Evans.

Therefore, considering the totality of the circumstances and weighing the extensive inculpatory evidence against the meager exculpatory evidence, this Court may as a matter of law rule that Detective Davies and Sergeant Rivera had probable cause to arrest Mrs. Evans.

Accordingly, Defendants are entitled to summary judgment on Plaintiffs' claim for unlawful arrest under Section 1983 of the Civil Rights Act.

>    B.    PLAINTIFFS' SECTION 1983 CLAIM FOR UNLAWFUL DETENTION AND/OR FALSE IMPRISONMENT FAILS AS A MATTER OF LAW.

A plaintiff may assert a Section 1983 claim for unlawful detention, also referred to as false imprisonment, under both the Fourth and Fourteenth Amendment. Potts, 224 F. Supp. 2d. at 936. Plaintiffs' Section 1983 claims for unlawful detention under the Fourth and Fourteenth Amendments, however, fail as a matter of law.

>    1.    Plaintiffs' Section 1983 Claim for Unlawful Detention under the Fourth Amendment Fails as a Matter of Law.

In the context of a Section 1983 claim, "the Fourth Amendment requires 'the States to provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty.'" Id. (quoting Baker v. McCollan, 443 U.S. 137, 143 (1979)). A plaintiff cannot establish a claim for unlawful detention under the Fourth Amendment, however, if the plaintiff's arrest was based on probable cause. Potts, 224 F. Supp. 2d at 936 (citing Baker, 443 U.S. at 143).

In this matter, as set forth in Section I, Subsection A above, Judge Valdez's decision to issue the Search Warrant was based on probable cause and Detective Davies and Sergeant Rivera had probable cause to arrest Mrs. Evans. Therefore, Plaintiffs, as a matter of law, cannot establish a Section 1983 claim for unlawful detention and/or false imprisonment under the Fourth Amendment.

2. <u>Plaintiffs' Section 1983 Claim for Unlawful Detention under the Fourteenth Amendment Fails as a Matter of Law</u>.

Unlawful detention also implicates the Fourteenth Amendment's protection against deprivation of liberty without due process of law. <u>Potts</u>, 224 F. Supp. 2d at 937 (citing <u>Baker</u>, 443 U.S. at 142). The Supreme Court, in <u>Baker</u>, suggested that prolonged detention of a suspect, in the face of a person's protestation of innocence, may violate the Fourteenth Amendment; however, the Court "held that detention for three days 'does not and could not amount to such a deprivation.'" <u>Potts</u>, 224 F. Supp. 2d at 937 (quoting <u>Baker</u>, 443 U.S. at 143).

In this matter, Mrs. Evans was arrested by Detective Davies and Sergeant Rivera on May 25, 2006, at approximately 2:30 p.m., and was released later that same day. <u>See</u> Return of Search Warrant attached hereto as Exhibit "B" and incorporated herein by this reference. Mrs. Evans' detention for a few hours was not even remotely close to a period in excess of three days and it clearly did not deprive her of liberty without due process of law in violation of the Fourteenth Amendment. Therefore, Plaintiffs, as a matter of law, cannot establish a claim against Defendants under Section 1983 for unlawful detention and/or false imprisonment. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' Section 1983 claims for unlawful detention and/or false imprisonment.

**II. PLAINTIFFS' CLAIMS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, FALSE ARREST, AND RECKLESS POLICE WORK UNDER ARTICLE I, SECTION 9 OF THE UTAH CONSTITUTION FAIL AS A MATTER OF LAW BECAUSE PLAINTIFFS WERE NOT TREATED WITH UNNECESSARY RIGOR.**

Article I, Section 9 of the Utah Constitution provides that "[e]xcessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be

inflicted.  Persons arrested or imprisoned shall not be treated with *<u>unnecessary rigor</u>*."  Utah

Const., art. I, § 9 (emphasis added).  "Rigor," as defined by the Utah Supreme Court, is "'an act

or instance of strictness, severity, harshness, oppression, or cruelty.'"  <u>Dexter v. Bosko</u>, 2008 UT

29, ¶ 12 (quoting Webster's Third New International Dictionary 1957 (1986)).  Consequently,

one suffers from unnecessary rigor "when subject to unreasonably harsh, strict, or severe

treatment."  <u>Dexter</u>, 2008 UT 29, ¶ 19.  "A violation of the prohibition on unnecessary rigor must

arise from 'treatment that is clearly excessive or deficient and unjustified, not merely the

frustrations, inconveniences, and irritations that are common to prison life.'"  <u>Id</u>. (quoting <u>Bott v.

DeLand</u>, 922 P.2d 732, 741 (Utah 1996)).

        Moreover, the conduct alleged to constitute unnecessary rigor must be a flagrant violation

of an individual's constitutional rights and not merely a negligent act.  <u>Dexter</u>, 2008 UT 29, ¶¶

21-22.  A flagrant violation of the unnecessary rigor clause occurs "whenever the following two

elements are established: First, the nature of the act presents an obvious and known serious risk

of harm to the arrested or imprisoned person; and second, knowing of that risk, the official acts

without other reasonable justification."  <u>Id</u>. ¶ 25.

        In this matter, Plaintiffs' claims under Article I, Section 9 of the Utah Constitution fail as

a matter of law for at least the following reasons which establish that Plaintiffs were not treated

with unnecessary rigor.  *First*, there is simply no evidence to suggest that, for the brief period of

time that Mrs. Evans was arrested until she was released, Mrs. Evans was subjected to

unreasonably harsh, strict, or severe treatment or treated in a manner that was clearly excessive,

deficient, and/or unjustified.

*Second*, it was reasonable for Detective Davies and Sergeant Rivera to arrest Mrs. Evans for obstruction of justice.  During the execution of the Search Warrant, Mrs. Evans refused to cooperate with Detective Davies and Sergeant Rivera.  <u>See</u> <u>id</u>. ¶¶ 43-45.  Detective Davies, nevertheless, provided Mrs. Evans with multiple opportunities to avoid being arrested for obstruction of justice by disclosing the location of the Dog.  <u>See</u> <u>id</u>. ¶¶ 43-44.  Only after Mrs. Evans' resolve to obstruct the efforts of Detective Davies and Sergeant Rivera was very apparent did Detective Davies and Sergeant Rivera arrest Mrs. Evans for obstruction of justice.  <u>See</u> <u>id</u>. ¶ 45.

*Third*, given the facts and circumstances within the knowledge of Defendants, it was a reasonable police practice to investigate the theft of the Dog.  Mrs. Lenning and/or Ms. Dirker informed Defendants that persons unknown to her had taken the Dog without permission and fled the scene.  <u>See</u> Davies Affidavit ¶¶ 7 & 13.  Ms. Dirker informed Defendants that: 1) she owned the Dog; 2) she had not given anyone permission to take the Dog; and 3) she had cared for the Dog until it was stolen on May 11, 2006.  <u>See</u> <u>id</u>. ¶¶ 6-7 & 9-11.  Upon further investigation, Mr. Evans expressly confirmed the information Mrs. Lenning and/or Ms. Dirker provided to Defendants, and informed Detective Davies, on more than one occasion, that he was in possession of the Dog, but he was unwilling to relinquish the Dog to Detective Davies or Ms. Dirker.  <u>See</u> <u>id</u>. ¶¶ 24 & 34.

*Fourth*, Defendants performed a reasonable police investigation of the theft of the Dog.  Upon being informed of the theft of the Dog by Mrs. Lenning, Defendants obtained information from Mrs. Lenning, Ms. Dirker, Mrs. Evans, and Mr. Evans regarding the theft of the Dog.  <u>See</u>

id. ¶¶ 8-20, 23-26, & 28.  Based upon the information obtained by Defendants, the Dog was residing at the Lennings' residence on May 11, 2006; Ms. Dirker was caring for the Dog on May 11, 2006; Mr. Evans and his son removed the Dog from the Lennings' residence without permission on May 11, 2006; the Evans were in possession of the Dog on May 22, 2006; and Mr. Evans informed Detective Davies that he was unwilling to relinquish the Dog to Detective Davies or Ms. Dirker.  See id. ¶¶ 6-7, 11, 13, 24 & 34.  Detective Davies, in an attempt to resolve the ongoing criminal investigation of the theft of the Dog without any criminal charges, encouraged both Mr. and Mrs. Evans to relinquish the Dog and resolve the dispute as to the ownership of the Dog in civil court.  See id. ¶¶ 20-22 & 26-27.  Nevertheless, Mr. and Mrs. Evans refused to relinquish the Dog until after the Search Warrant was executed at their home and Mrs. Evans was arrested for obstruction of justice.  See id. ¶¶ 39, 45, & 56.

*Fifth*, Defendants' actions exceeded what is reasonably expected of a police officer or agency on various occasions throughout the investigation.  Detective Davies expressly informed Mr. Evans that no further police action would be taken if he would merely relinquish the Dog and seek civil court redress to resolve the dispute as to the ownership of the Dog.  See id. ¶ 33.  Only after Mr. Evans' resolve and unwillingness to relinquish the Dog was very apparent did Defendants obtain the Search Warrant to retrieve the Dog.  Detective Davies also provided Mrs. Evans with multiple opportunities to avoid being arrested for obstruction of justice by disclosing the location of the Dog.  See id. ¶¶ 43-44.  Only after Mrs. Evans' resolve to obstruct the efforts of Detective Davies and Sergeant Rivera was very apparent did Detective Davies and Sergeant Rivera arrest Mrs. Evans for obstruction of justice.  See id. ¶ 45.

*Sixth*, it was reasonable for Detective Davies to obtain the Search Warrant. Mr. Evans informed Detective Davies, on more than one occasion, that he was in possession of the Dog, but he was unwilling to relinquish the Dog to Detective Davies or Ms. Dirker. See id. ¶¶ 24 & 34. Mr. Evans further informed Detective Davies that a search warrant would be necessary if Detective Davies intended to return to Mr. Evans' residence after May 22, 2006. See id. ¶ 28. Detective Davies honored and accommodated Mr. Evans' right to refuse a search by consent of his residence by obtaining the Search Warrant prior to returning to the Evans' residence. See id. ¶ 35. Detective Davies obtained the Search Warrant only after Mr. Evans again refused to relinquish the Dog and after he reviewed the case with the District Attorneys' Office to verify that Mr. Evans' conduct constituted a theft. See id. ¶¶ 34-35. Once the District Attorneys' Office determined that there was probable cause to issue the Search Warrant and probable cause to believe that Mr. Evans' conduct constituted a crime, it would have been unreasonable for Detective Davies to fail to seek the Search Warrant.

*Seventh*, Taylorsville and Larry Marx properly supervised Detective Davies and the investigation into the theft of the Dog. Prior to the execution of the Search Warrant and the arrest of Mrs. Evans, Detective Davies consulted with Sergeant Rivera, a ranking officer, about Mr. Evans' insistence on a search warrant prior to returning to the Evans' residence and about whether Detective Davies should pursue a search warrant. See id. ¶¶ 37-38. Detective Davies further submitted the Affidavit for Search Warrant and the Operation Plan to Sergeant Rivera for her review. Chief Marx was also consulted and approved the Operation Plan drafted by Detective Davies. See id. ¶¶ 37. Detective Davies, on at least two separate occasions, consulted

the District Attorneys' Office regarding the theft of the Dog and the grounds for the Search Warrant.  See id. ¶¶ 29 & 35.  Detective Davies' actions and the review of these actions by Sergeant Rivera, Chief Marx, and the District Attorneys' Office were consistent with good police management practice.

Based upon the foregoing reasonable actions by Defendants, Plaintiffs have not and cannot establish that: (1) Defendants subjected Plaintiffs to unreasonably harsh, strict, or severe treatment; (2) Defendants treated Plaintiffs in a manner that was clearly excessive, deficient, and/or unjustified; (3) Defendants flagrantly violated Plaintiffs' constitutional rights; and (4) the nature of Defendants' acts present an obvious and known serious risk of harm to Plaintiffs. Dexter, 2008 UT 29, ¶¶ 19, 21-22, & 25.  Plaintiffs' claims for intentional infliction of emotional distress, false arrest, and reckless police work under Article I, Section 9 of the Utah Constitution, therefore, fail as a matter of law.  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' claims for intentional infliction of emotional distress, false arrest, and reckless police work under Article I, Section 9 of the Utah Constitution.

### III.    PLAINTIFFS' CLAIM FOR ABUSE OF PROCESS FAILS AS A MATTER OF LAW.

Because the legal process in this matter was used for its proper and intended purpose, Plaintiffs' claim for abuse of process fails as a matter of law.  Similarly, because Defendants' investigation into the theft of the Dog had no ulterior purpose and Defendants' conduct in this matter does not constitute a wilful act, Plaintiffs' claim for abuse of process fails as a matter of law.

*THE LEGAL PROCESS IN THIS MATTER WAS USED FOR ITS PROPER AND INTENDED PURPOSE.*

"The misuse of legal process becomes actionable when it is used *primarily* to accomplish a purpose for which it is not designed." Hatch v. Davis, 2006 UT 44, ¶ 34, 147 P.3d 383, 389, (emphasis added) (citations omitted). If the legal process is used for its proper and intended purpose, however, "the mere fact that it has some other collateral effect does not constitute abuse of process." Bennett v. Jones, Waldo, Holbrook, & McDonough, 2003 UT 9, ¶ 48, 70 P.3d 17, 29 (citations omitted). Moreover, "there is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or ulterior purpose of benefit of the defendant." *Id*. at 29, ¶ 49 (citations omitted).

Here, the legal process was used for its proper and intended purpose—to retrieve the stolen Dog.[1] Taylorsville and Detective Davies were informed that the Dog had been stolen. Davies Affidavit ¶¶ 4-12. Mr. Evans acknowledged and informed Detective Davies that he removed the Dog from the Lennings' residence but refused to relinquish the Dog. See id. ¶¶ 24-25, & 34. Based upon Mr. Evans' refusal to relinquish the Dog, Taylorsville and Detective Davies used the legal process to retrieve the stolen Dog. Such use of the legal process was

---

[1] Prior to the use of legal process in this matter and as a courtesy to Mr. and Mrs. Evans, Defendants made a concerted effort to provide Mr. and Mrs. Evans with various opportunities to avoid criminal charges and the legal process entirely. First, despite the unlawful conduct of Mr. Evans and his son in taking the Dog from the Lennings' residence without permission, Detective Davies expressly informed Mr. Evans that no further police action would be taken if he would merely relinquish the Dog. Davies Affidavit ¶ 33. Second, Detective Davies provided Mrs. Evans with multiple opportunities to disclose the location of the Dog and avoid being arrested for obstruction of justice. See id. ¶¶ 42-43. Third, Detective Davies encouraged both Mr. and Mrs. Evans to seek civil court redress to resolve the dispute regarding the ownership of the Dog. See id. ¶¶ 20-22 & 26-27. Nevertheless, Mr. and Mrs. Evans' repetitive and persistent refusal to cooperate with Defendants necessitated the use of the legal process.

proper.[2]  Therefore, because the legal process was used for its proper and intended purpose in

this matter, Plaintiffs' claim for abuse of process fails as a matter of law and should be

dismissed.

      *B.*     *DEFENDANTS' HAD NO ULTERIOR PURPOSE IN THE INVESTIGATION OF THE THEFT OF THE DOG AND THEIR INVESTIGATION AND CONDUCT IN THIS MATTER DOES NOT CONSTITUTE A WILFUL ACT.*

    The "essence" of the tort of abuse of process is 'a perversion of the process to accomplish

some improper purpose.'" <u>Hatch</u>, 2006 UT 44, ¶ 34 (quoting <u>Crease v. Pleasant Gove City</u>, 519

P.2d 888, 890 (1974).  The elements of abuse of process, however, reach beyond the "essence"

of the tort and require a party, to state a claim for abuse of process, to "allege both 'an ulterior

purpose' and 'a wilful act' in the use of the process not proper in the regular conduct of the

proceeding." <u>Hatch</u>, 2006 UT 44, ¶ 36 (citations omitted).  To satisfy the "wilful act"

requirement, "a party must point to conduct independent of legal process itself that corroborates

the alleged improper purpose." <u>Id</u>. ¶ 39 (citations omitted).  "Use of legal process with a bad

motive alone does not defeat that right; a corroborating act of a nature other than legal process is

also necessary." <u>Id</u>. (citations omitted).

    Here, Plaintiffs' allegations that Detective Davies had a personal relationship with the

Lennings: (a) is insufficient to create an ulterior purpose; (b) is insufficient to constitute a wilful

act; and (c) clearly fails to establish that Defendants' actions were a perversion of the process to

accomplish some improper purpose.  Detective Davies, while on duty as a police office with the

---

[2] Similarly, Detective Davies and Sergeant Rivera's use of the legal process in arresting Mrs. Evans, after she refused to cooperate with Detective Davies and Sergeant Rivera, acted with the intent to hinder, delay, or prevent the investigation of the Dog, and/or provided false information regarding a material aspect of the investigation, was proper. <u>See id</u>. ¶¶ 43-45.

Taylorsville Police Department, encountered Ms. Dirker and the Lennings on merely one occasion prior to the criminal investigation into the theft of the Dog. See id. ¶ 60. At no time was Detective Davies ever employed in any capacity by the Lennings or Ms. Dirker, and at no time did Detective Davies ever receive any compensation from the Lennings and/or Ms. Dirker. See id. ¶¶ 68-69. Simply put, Detective Davies' one chance encounter with Ms. Dirker and the Lennings prior to conducting this investigation: (a) is insufficient to create an ulterior purpose or to constitute a wilful act; and (b) in no way affected the investigation conducted by Detective Davies and Taylorsville pertaining to the theft of the Dog. See id. ¶¶ 60-70. Therefore, Plaintiffs' claim for abuse of process fails as a matter of law and should be dismissed.

Similarly, Plaintiffs' allegations that Defendants' actions in arresting Mrs. Evans, obtaining the issuance of a Juvenile Petition against Justin Evans, and informing Mr. Evans that he may be arrested if he failed to relinquish the Dog: (a) are insufficient to create an ulterior purpose; (b) are insufficient to constitute a wilful act; and (c) fail to establish that Defendants' actions were a perversion of the process to accomplish some improper purpose. More specifically, Plaintiffs' allegations fail to point to conduct independent of legal process itself to corroborate an alleged improper purpose and, thus, are insufficient to establish that Defendants engaged in a wilful act. Therefore, Plaintiffs' claim for abuse of process fails as a matter of law and should be dismissed.

**IV.** **PLAINTIFFS' CLAIM FOR ATTORNEY FEES, PURSUANT TO SECTION 1988 OF THE CIVIL RIGHTS ACT, FAILS AS A MATTER OF LAW.**

Section 1988 of the Civil Rights Act provides, in pertinent part, that , "[i]n any action or proceeding to enforce a provision of Section … 1983 …, the court, in its discretion, may allow the prev*ailing party* … a reasonable attorney's fee as part of the costs …. 42 U.S.C. § 1988(b) (emphasis added).

In this matter, Plaintiffs are not entitled to attorneys' fees because they cannot prevail on any of their alleged claims under Section 1983 of the Civil Rights Act. In particular, because Judge Valdez's decision to issue the Search Warrant was based on probable cause and because Detective Davies and Sergeant Rivera had probable cause to arrest Mrs. Evans as set forth in Section I, Subsection A above, Plaintiffs' claims for unlawful arrest, unlawful detention, and/or false imprisonment under Section 1983 of the Civil Rights Act fail as a matter of law. Furthermore, because Mrs. Evans' detention, after she was arrested for a few hours, was not even remotely close to a period in excess of three days as set forth in Section I, Subsection B above, Defendants did not deprive her of liberty without due process of law in violation of the Fourteenth Amendment. Therefore, Plaintiffs, as a matter of law, cannot establish a claim against Defendants under Section 1983 of the Civil Rights Act. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' claim for attorneys' fees under Section 1988 of the Civil Rights Act.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs' claims under Section 1983 of the Civil Rights Act, under Article I, Section 9 of the Utah Constitution, for abuse of process, and for attorney fees under Section 1988 of the Civil Rights Act fail as a matter of law. Therefore, Defendants' *Motion for Summary Judgment* should be granted.

DATED this 11th day of December, 2008.

**PARSONS KINGHORN HARRIS**
**A Professional Corporation**


By:     /s/ Lisa R. Petersen
            Lisa R. Petersen
            Michael D. Kendall

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of December, 2008, I electronically filed the foregoing **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Loni Radmall, Esq.  
8120 Royal Lane  
Sandy, UT 84093  
Lr83@byu.net  

Jerrald D. Conder, Esq.  
341 South Main Street, Suite 406  
Salt Lake City, UT  841118  
Jerrald53@aol.com  

/s/ Lisa R. Petersen